# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

**ALFREDO VILLOLDO, individually, and**
**GUSTAVO E. VILLOLDO, individually, and**
**as Administrator, Executor, and Personal**
**Representative of the ESTATE OF GUSTAVO**
**VILLOLDO ARGILAGOS,**

   **Plaintiffs,**

  **v.**

**FIDEL CASTRO RUZ, as an individual, and as**
**an official, employee, or agent of The Republic**
**of Cuba, RAUL CASTRO RUZ, as an**
**individual, and as an official, employee, or**
**agent of The Republic of Cuba, THE**
**MINISTRY OF INTERIOR, an agency or**
**Instrumentality of The Republic of Cuba, THE**
**ARMY OF THE REPUBLIC OF CUBA,**
**an agency or instrumentality of the Republic of**
**Cuba, and THE REPUBLIC OF CUBA, a**
**foreign state,**

   **Defendants.**
_____

       **NO. 13-mc-94014-TSH**

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO COMPEL RE-ISSUANCE OF CERTIFICATED SHARES (Docket No. 37), and MOTION FOR ORDER TO COMPLETE TURNOVER AND SET BOND FOR RE-ISSUANCE OF CERTIFICATED SHARES (Docket No. 49)

**July 7, 2015**

**HILLMAN, D.J.**

### Introduction

Plaintiffs Alfredo Villoldo, Gustavo Villoldo, and the Estate of Gustavo Villoldo

Argilagos ("Plaintiffs") seek the turnover of 383 securities accounts held by Trustee-Process

Defendant Computershare, Inc. ("Computershare"). The accounts ("Computershare accounts")

were opened in the 1950s by seventy individuals with Cuban addresses. Computershare, located in Canton, Massachusetts, is a transfer agent of U.S.-based securities issuers. Plaintiffs seek the turnover of the Computershare accounts in execution of a default judgment obtained by Plaintiffs in a Florida state court against Defendants Fidel Castro Ruz, Raul Castro Ruz, the Ministry of the Interior, the Army of the Republic of Cuba, and the Republic of Cuba. The judgment was awarded for the wrongful death and personal injuries of Gustavo Villoldo Argilagos, who was abducted, imprisoned, and tortured by the Castro regime following the Cuban Revolution. Plaintiffs are the sons and estate of Gustavo Villoldo Argilagos.

This Court granted Plaintiffs' initial *ex parte* motion for turnover on December 11, 2013. (Docket No. 27) ("Turnover Order"). The Court found that under Cuban Law Nos. 567 and 568, the Computershare accounts are owned by the Republic of Cuba, and are therefore subject to attachment and execution to satisfy Plaintiffs' judgment under the Terrorism Risk Insurance Act of 2002 and the Foreign Sovereign Immunities Act. The Court issued a trustee summons and Computershare filed an answer on December 31, 2013, in which it indicated that it would not oppose the turnover of the accounts within its possession. (Docket No. 30).

On April 2, 2014, however, Computershare had a change of heart and filed an emergency motion for a continuance of the turnover process, citing "the myriad of regulatory, contractual, and statutory securities issues" raised by the Turnover Order. (Docket No. 45). The Court granted the continuance, prompting Plaintiffs to file a motion for an order directing Computershare to complete the turnover process. (Docket No. 49). Subsequently, the United States filed a statement of interest urging the Court rescind the Turnover Order. (Docket No. 69).

Specifically, the United States asked the Court to reconsider its conclusion that the accounts are owned by Cuba.[1]

In an order dated January 8, 2015, this Court determined that it would reconsider the Turnover Order and requested additional briefing from the parties on whether Cuban Law Nos. 567 and 568 vested ownership of the Computershare accounts in Cuba. (Docket No. 85). For the following reasons, the Turnover Order (Docket No. 27) and the Order Directing Turnover of Book Shares and Cash Accounts (Docket No. 35) are ***vacated***. Plaintiffs' Motion to Compel Re-Issuance of Certificated Shares (Docket No. 37) and Motion for Order to Complete Turnover and Set Bond for Re-Issuance of Certificated Shares (Docket No. 49) are ***denied***.

## Discussion

The Foreign Sovereign Immunities Act (FSIA) provides that "a foreign state will be 'immune from the jurisdiction of the courts of the United States and of the States.'" *Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, 211 (2d Cir. 2014) (citing 28 U.S.C. § 1604 (1988)). However, Congress has created certain terrorism-related exceptions to the general immunity that foreign sovereigns enjoy in federal and state courts. One of those exceptions is § 201 of the Terrorism Risk Insurance Act (TRIA), which makes liable terrorist states for judgments obtained against them in U.S. courts. Section 201(a) provides:

> Notwithstanding any other provision of law . . . , in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605A] . . . , *the blocked assets of that terrorist party* (including the blocked assets of any agency or

---

[1] The Computershare accounts consist of three classes of assets: book shares, cash accounts, and certificated shares. In its trustee-process answer, Computershare indicated that it could not turn over the certificated shares because it did not possess the physical stock certificates. (Docket No. 30). Consequently, the Court entered a second turnover order directing Computershare to turn over the assets that it did possess—the book shares and cash accounts. (Docket No. 35). With respect to the certificated shares, Plaintiffs moved for an order directing Computershare to reissue the stock certificates. (Docket No. 37). The Court has not yet ruled on that motion. Thus, pending before this Court are Plaintiffs' motions for orders directing (1) completion of the turnover of the book shares and cash accounts (Docket No. 49); and (2) the reissuance of certificated shares (Docket No. 37). Both of the requested orders are contingent upon Plaintiffs' assertion that the accounts are owned by the Republic of Cuba.

instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

Terrorism Risk Insurance Act of 2002, § 201(a), Pub. L. No. 107-297, 116 Stat. 2322, (codified at 28 U.S.C. § 1610 Note "Satisfaction of Judgments from Blocked Assets of Terrorists, Terrorist Organizations, and State Sponsors of Terrorism") (hereinafter "TRIA § 201(a)") (emphasis added).

The issue before this Court is whether the Computershare accounts are owned by the Republic of Cuba. If so, TRIA § 201(a) allows Plaintiffs to attach the accounts in satisfaction of their Florida state court judgment.[2] Plaintiffs argue that the accounts, which are held in the names of seventy account holders believed to be Cuban nationals, are the property of Cuba. According to Plaintiffs, Cuban Law Nos. 567 and 568 made it illegal for Cuban nationals to hold investments in foreign companies and any such assets were automatically nationalized pursuant to those laws in the early to mid-1960s. Therefore, Plaintiffs claim that the Computershare accounts are owned by Cuba. Computershare and the United States raise three impediments to this theory of recovery. First, they argue that Cuban Law Nos. 567 and 568 cannot be given extraterritorial effect by this Court. Second, they contend that the penal law rule precludes application of the Cuban laws. Third, Computershare and the United States assert that, by their plain language, the Cuban laws did not nationalize the Computershare accounts.

---

[2] As explained in the Court's order of January 8, 2015, the Computershare accounts are "blocked assets" and Cuba is a "terrorist party" within the meaning of the statute, because the accounts have been frozen by the Department of Treasury's Office of Foreign Assets Control (OFAC), and Cuba has been designated as a state sponsor of terror since 1982. The President's announcement on April 14, 2015 that Cuba would be removed from the list of state sponsors of terror has no effect on this proceeding because Cuba was designated as a state sponsor of terror at the time the terrorist acts occurred. *See Kilburn v. Republic of Iran*, 441 F. Supp. 2d 74, 77-78 (D.D.C. 2006); *see also* Florida State Court Final Judgment, Docket No. 9, Ex. A (describing acts of terror committed by Castro regime against Plaintiffs).

<u>*The Act of State Doctrine and the Extraterritorial Effect Rule*</u>

Computershare and the United States first assert that the Cuban laws cannot be given extraterritorial effect. Courts in the United States are precluded "from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Hilton v. Kerry*, 754 F.3d 79, 85 n.4 (1st Cir. 2014) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 84 S.Ct. 923 (1964)). This general rule, known as the act of state doctrine, arises from our government's system of separation of powers and the recognition that the executive branch bears primary responsibility for conducting foreign affairs. *See Tchacosh Co., Ltd. v. Tockwell Intern. Corp.*, 766 F.2d 1333, 1336 (9th Cir. 1985). Decrees by foreign governments purporting to confiscate property are "the very archetype of an act of state." *Republic of Iraq v. First Nat'l City Bank*, 353 F.2d 47, 50 (2d Cir. 1965).

However, the act of state doctrine only forbids judicial examination of "taking[s] by a foreign sovereign of property *within its own territory*," and does not bar inquiry into the expropriation of property located outside the foreign state.[3] *Id.* at 51 (emphasis added); *see also Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, 658 F.2d 903, 908 (2d Cir. 1981). U.S. courts generally "will not give extra-territorial effect to a confiscatory decree of a foreign state, even where directed against its own nationals." *Maltina Corp. v. Cawy Bottling Co.*, 462 F.2d 1021, 1025 (5th Cir. 1972). This is true regardless of whether the foreign state

---

[3] The Ninth Circuit has explained the basis for this exception to the act of state doctrine:

> The rationale underlying the extraterritorial exception follows from the considerations which support the act of state doctrine. The obvious inability of a foreign state to complete an expropriation of property beyond its borders reduces the foreign state's expectations of dominion over that property. Consequently, the potential for offense to a foreign state is reduced, as well as the need for judicial deference to the other branches of government. Also, judicial enforcement of judgments becomes possible when property is located within United States territory.

*Tchacosh*, 766 F.2d at 1337 (internal quotations and citations omitted).

attempts to expropriate property of individuals or a domestic corporation. *See Republic of Iraq*, 353 F.2d at 51. The prevailing rule is that when property is located in the United States at the time of the foreign state's attempted confiscation, U.S. courts will recognize the foreign decree only if it would be "consistent with the policy and law of the United States." *Id.* (quoting Restatement of Foreign Relations Law of the United States § 46); *see also Chemical Bank*, 658 F.2d at 908-09 (discussing *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758 (1937)).

Plaintiffs contend that the extraterritorial effect rule does not apply because Cuban Law Nos. 567 and 568 caused assets of Cuban nationals to be "forfeited" to the Cuban government rather than "confiscated" or "expropriated." Plaintiffs cite no authority for this semantic distinction and the Court rejects it.[4] The interpretation of the Cuban laws advanced by Plaintiffs would eliminate the rights of the Cuban nationals to the Computershare accounts and vest ownership in the Republic of Cuba. *See* Decl. of Jorge Salazar-Carrillo, Docket No. 95, Ex. A-1; Decl. of Jaime Suchlicki, Docket No. 95, Ex. B. Further, the parties do not dispute that the accounts are located in Massachusetts. Thus, "it is appropriate to treat [the Cuban laws] as . . . foreign decree[s] purporting to expropriate property located within the United States." *Maltina*, 462 F.2d at 1027. The question for the Court, then, is whether it would be consistent with United States policy and law to recognize the validity of Cuban Law Nos. 567 and 568. Clearly, it would not.

---

[4] The only cases relied on by Plaintiffs for this proposition deal with acts of the United States—not foreign states—to compel or authorize the return of currency to its country of origin, and therefore do not implicate the foreign affairs principles undergirding the act of state doctrine and the extraterritorial effect rule. *See Ling Su Fan v. United States*, 218 U.S. 302 (1910) (examining Congressional delegation of authority to coin money to Phillipine government while Phillipine Islands were under the control of United States); *Nortz v. United States*, 294 U.S. 317 (1935) (examining Congressional restrictions on ownership of gold); *United States v. Bankers Trust Co.*, 294 U.S. 240 (1935) (same); *Perry v. United States*, 294 U.S. 330 (1935) (same); *Langbord v. U.S. Dep. of the Treas.*, 888 F. Supp. 2d 606 (E.D. Pa. 2012) (same). In any event, those cases do not draw a distinction between the terms "forfeiture" and "confiscation" or "expropriation." In fact, in one of the principal extraterritorial effect cases, the Fifth Circuit used "forfeiture" to describe the transfer of property rights required by the foreign law in question. *See Maltina*, 462 F.2d at 1027.

<u>*Whether recognition of Cuban Law Nos. 567 & 568 is consistent with U.S. policy and law*</u>

Principles embodied in the Fifth Amendment to the U.S. Constitution prohibit the state from depriving individuals of property without compensation. *See Maltina*, 462 F.2d at 1027. This alone is grounds for the Court to find that Cuban Law Nos. 567 and 568 are incompatible with the policy and law of the United States.[5] *See United Bank Ltd. v. Cosmic Int'l., Inc.*, 542 F.2d 868, 872-877 (2d Cir. 1976) (refusing to recognize Bangladesh law purporting to expropriate payment due to successors of Pakistani corporations from American company); *Menendez v. Saks & Co.*, 485 F.2d 1355, 1364 (2d Cir. 1973) (refusing to recognize Cuban law purporting to seize Cuban cigar companies' accounts receivable located in United States); *Maltina*, 462 F.2d at 1027 (refusing to recognize Cuban law purporting to expropriate Cuban corporation's trademark rights in United States); *Republic of Iraq*, 353 F.2d at 51-52 (refusing to recognize Iraqi law purporting to confiscate former Iraqi king's bank accounts located in New York); *cf. Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.*, 840 F.2d 72, 75 (D.C. Cir. 1988) (observing that "had Spain attempted to expropriate without compensation property . . . within the United States at the time of expropriation, our courts would not assist Spain in obtaining such property").

Nonetheless, Plaintiffs assert that the Cuban laws should be enforced and urge the Court to conclude that this case is controlled by *Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, in which the Second Circuit gave effect to a similar Cuban law. 658 F.2d 903, 909 (2d Cir. 1981). In *Chemical Bank,* Banco Nacional sued as the successor-in-interest of private Cuban banks to recover certain assets held in the United States. *Id.* at 905-6. The private banks, which were incorporated and domiciled in Cuba, were nationalized in 1960 pursuant to Cuban Law No.

---

[5] There is no indication, and Plaintiffs do not argue, that the original owners of the Computershare accounts were compensated by the Cuban government.

891 and taken over by Banco Nacional, the country's central bank. *Id.* Banco Nacional filed an action in federal court the following year, seeking to recoup substantial deposits the private Cuban banks had made with three American banks. *Id.* at 906. The district judge ruled that Banco Nacional was unable to assert the claims as successor because the assets were located in the United States and the foreign expropriation could not be given extraterritorial effect. *Id.* at 907.

The Second Circuit reversed. The court acknowledged that Cuban Law No. 891 expropriated property in the United States, but gave effect to the law anyway. *Id.* at 909. Interpreting the Supreme Court's decision in *United States v. Belmont*,[6] 301 U.S. 324, 57 S.Ct. 758 (1937), the court articulated a modified formulation of the extraterritorial effect rule, stating that when "enforcement [of a foreign confiscatory law] has promised to further, rather than violate, the policy aims of the United States," courts may recognize foreign expropriations. *Chemical Bank*, 658 F.2d at 908-09. The court concluded that enforcing the Cuban government's ownership of the assets would further American policy aims, because any assets awarded to Banco Nacional would "be paid into a frozen account [to] be distributed by the United States Foreign Claims Settlement Commission to American nationals [with] valid claims against Cuba." *Id.* at 909. Central to the result was the court's supplemental conclusion that, given the

---

[6] In *Belmont*, the Supreme Court gave effect to the Soviet expropriation of assets that a Russian corporation deposited in a New York bank account. 301 U.S. 324, 57 S.Ct. 758 (1937). As a product of treaty negotiations between the two nations, the Soviet government had assigned to the United States all claims that it had against American nationals, including the claim to the assets in the New York bank account. *Id.* at 326-27. The United States intended to collect the assets as part of its effort to create a fund from which American nationals with valid claims against the Soviet government could be compensated. *Id.* The Court found that recognizing the expropriation of the New York account would advance national policy objectives, because it would allow the United States to amass the compensation fund contemplated in its treaty negotiations. *Id.* at 330-32. Given this overriding national policy interest, the Court stated that the question of whether the Soviet expropriation was a taking without compensation was "not a matter for judicial consideration here." *Id.* at 332.

circumstances of the case, it was inconsequential that the private bankers had not been
compensated:

> While United States law of course does not approve the taking of private property
> without compensation, the former owners of the Private Banks have lodged no protest,
> either by bringing suit to recover their United States property, or by seeking to intervene
> in Banco Nacional's suits. In the twenty years during which these suits have been
> pending, the former owners have not asserted any conflicting claim. Thus we cannot say
> that the effect in this case of recognizing the Cuban nationalization of the Private Banks
> would violate United States policy.

*Id.* at 909. Thus, in determining whether to give extraterritorial effect to Cuban Law No.
891, the Second Circuit weighed the promotion of an affirmative American policy goal—making
available assets for individuals with valid claims against the Cuban government—against the
Fifth Amendment policy proscribing takings without compensation. Finding the Fifth
Amendment concerns to be significantly diminished because the original owners had never
asserted their rights to the assets, the Court concluded that by recognizing the expropriation,
"United States policy will be furthered rather than violated." *Id.*

Plaintiffs assert that the same result should follow here. They argue that enforcement of
Cuban Law Nos. 567 and 568 will further the national policy aims embodied in TRIA, and that
this interest outweighs any Fifth Amendment concerns because the Cuban nationals have not
asserted ownership of the Computershare accounts. The Court disagrees.

First, enforcement of the Cuban laws will not further the policy aims of TRIA. One of the
principal goals of TRIA § 201(a) is to compensate victims of state-sponsored terrorism. *See
Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 938-39 (D.C. Cir. 2013) (discussing legislative
history of TRIA § 201). To be sure, ordering the turnover of the Computershare accounts would
compensate the Villoldo family and provide some measure of restitution for the terrorist acts
committed against them by the Castro regime. That is not the end of the story, though, because

TRIA is also intended to punish and deter terrorist states by making them liable for judgments obtained against them in our courts. *Id.* at 939-40; *see also* 148 Cong. Rec. 23,121 (Statement of Sen. Harkin) (noting that TRIA § 201 would "punish and impose a heavy cost" on state sponsors of terror and "deter future acts of terrorism"). The statute achieves this goal by ensuring that victims can only collect frozen assets that belong to state sponsors of terror.[7] *See* TRIA § 201(a) (making attachable the "blocked assets *of* that terrorist party") (emphasis added); *see also Heiser*, 735 F.3d at 939-40 (observing that Congress did not intend victims to be paid with assets not owned by a terrorist state).

Therefore, for the Court to give effect to Cuban Law Nos. 567 and 568, enforcement of the expropriation must further the policy of compensating victims *with assets owned by Cuba*. But the Computershare accounts are only owned by Cuba if the Court gives effect to Cuban Law Nos. 567 and 568. The Court refuses to adopt such a circular justification, because it would allow Cuba to escape TRIA's sanctions at the expense of the Cuban nationals who originally owned the accounts. This is precisely the concern that the D.C. Circuit found compelling in *Heiser v. Islamic Republic of Iran*, where the court determined that certain blocked assets with ties to Iran were not attachable under TRIA § 201(a).[8] 735 F.3d 934 (D.C. Cir. 2013). In reaching that conclusion, the court discussed the "acute" need to preserve the punitive effect of the law by ensuring that attachable assets are actually owned by the terrorist state. *Id.* at 939-40. The court emphasized that the policy goals of TRIA § 201 are not served where potentially

---

[7] Courts have differed in their interpretations of what property interest is sufficient for assets to be attachable under TRIA as the blocked assets "of" the terrorist party. *See Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993, 1001 n.2 (2d Cir. 2014); *Rubin v. Islamic Republic of Iran*, 709 F.3d 49, 54 (1st Cir. 2013). The precise answer to that question is immaterial here, however, because Plaintiffs argue that Cuban Law Nos. 567 and 568 vest *full* ownership of the assets in the Republic of Cuba.

[8] The frozen assets at issue in *Heiser* were electronic funds transfers blocked by OFAC because the beneficiaries of the transfers used Iranian banks. 735 F.3d at 935-36. Thus, Iranian entities did not own the assets, but had a contingent future possessory interest in them. *Id.* at 936-37.

innocent individuals pay the plaintiff's judgment, because it would allow the terrorist state to reduce its liability to victims and force innocent parties to unjustly bear the costs of the terrorist state's wrongdoing. *Id.* "Congress could not have intended such a result." *Id.* at 940.

Indeed, the United States has itself filed a statement of interest in this case, asserting that enforcement of the Cuban laws would be inconsistent with national policy interests. *See* Statement of Interest of the United States, Docket No. 69; Second Supp. Statement of Interest of the United States, Docket No. 93. The government states that recognition of Cuba's attempt to confiscate the assets of its citizens would undermine the punitive effect of TRIA and weaken the leverage of blocked assets as a tool of foreign policy. *See* Second Supp. Statement of Interest of the United States at 11-12. These concerns are heightened where, as here, one set of the Castro regime's victims would bear the cost of the regime's terrorist acts by paying Cuba's debt to other victims. *Id.* The Court gives significant weight to the government's representations of its own policy interests—especially in the context of foreign affairs.[9] Accordingly, the Court finds that the policy aims of TRIA will not be furthered by enforcement of the Cuban laws.

Second, substantial Fifth Amendment concerns are present in this case. In *Chemical Bank*, the Second Circuit was not concerned with the property rights of the original bank owners because in the twenty years in which the litigation had been pending, none had asserted a conflicting claim. 658 F.2d at 909. The potential claims of the Cuban nationals cannot be similarly dismissed. This litigation has only been pending for two years. The notice protocol ordered by the Court was not completed until December 2013, and the whereabouts of almost all

---

[9] In neither *Chemical Bank* nor *Belmont* did the United States government assert, as it does here, that the foreign expropriation would conflict with national policy. *See Chemical Bank*, 658 F.2d 903; *Belmont*, 301 U.S. 324. In fact, in *Belmont,* the United States was the party *seeking* the enforcement of the foreign expropriation, because it would advance the policy goal of creating a fund from which American nationals with valid claims against the Soviet government could be compensated. 301 U.S. at 326-27.

the account holders or their successors are still unknown.[10] Yet one woman has formally

objected to the turnover of her relative's account, *see* Letters from Maria Ana Abarrio Sainz,

Docket Nos. 32 & 63, and Computershare has identified two other objectors who did not receive

notice of this proceeding. *See* Trustee-Process Def.'s Resp. to Pl.'s Mot. to Complete Turnover,

Docket No. 59, Ex. 4 & 5. One of the individuals identified by Computershare has now filed an

affidavit asserting that she is the rightful owner of $38,000 worth of shares and dividends that

Plaintiffs seek to attach. *See* Decl. of Katia Ochoa, Docket No. 94, Ex. 1.

These competing claims suggest that other potential objectors may not have received

notice of this litigation, and raise significant questions about the propriety of enforcing Cuban

laws that expropriate privately owned securities located in the United States. The Fifth

Amendment concerns are particularly troublesome in this case because the Computershare

accounts are in the names of individuals—not domestic corporate entities that were dissolved or

nationalized by the Cuban government. Consequently, the Court concludes that significant Fifth

Amendment interests remain implicated, and recognition of Cuban Law Nos. 567 and 568 would

violate United States policy against takings without compensation.

Because enforcement of the Cuban laws would not further the policy of TRIA and would

violate the Fifth Amendment policy against takings without compensation, the expropriation of

the Computershare accounts is not consistent with United States policy and law. Therefore, the

Court will not give extraterritorial effect to Cuban Law Nos. 567 and 568 as they pertain to the

Computershare accounts. The accounts are not the property of the Republic of Cuba and are not

---

[10] The Court's Turnover Order adopted the Plaintiffs' proposed notice protocol, requiring Plaintiffs to send notice of the turnover proceeding, in English and Spanish, to the last known Cuban addresses of the seventy account holders. *See* Turnover Order, Docket No. 27. The addresses used were those provided by each Cuban national when the accounts were opened in the 1950s. Plaintiffs were also required to publish notice of the proceeding in the International Herald Tribune. *Id.* Plaintiffs certified their compliance with the notice requirements by January 16, 2014. *See* Pls.' Notice of Filing, Docket No. 29; Pls.' Notice of Filing Proof of Publication, Docket No. 31.

subject to attachment and execution. As this finding is dispositive, the Court does not reach the remaining issues raised by the parties.

## Conclusion

For the foregoing reasons, the Turnover Order (Docket No. 27) and the Order Directing Turnover of Book Shares and Cash Accounts (Docket No. 35) are ***vacated***. Plaintiffs' Motion to Compel Re-Issuance of Certificated Shares (Docket No. 37) and Motion for Order to Complete Turnover and Set Bond for Re-Issuance of Certificated Shares (Docket No. 49) are ***denied***. This case is dismissed.


SO ORDERED.


*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**